UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
TAE H. KIM, YOUNG M. CHOI, DONG M.
JU, HONG S. KIM, YOON C. KIM, CHUL G.          15 Civ. 3110
PARK, JIN H. PARK, EUTEMIO MORALES,
ZHE Y. SHEN, JONG H. SONG, and                 OPINION and ORDER
R. JULIAN VENTURA,

                    Plaintiffs,

       -against-

JI SUNG YOO a/k/a JISUNG YOO a/k/a
JI S. YOO a/k/a JAY YOO, SANDRA YOO
a/k/a SANDRA YEAR KUM YOO a/k/a
YEAR KUM YOO, SAMUEL D. YOO, and
CAROLYN YOO,

                    Defendants.
-----------------------------------------X

A P P E A R A N C E S:

       Attorneys for Plaintiffs

       ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
       99 Hudson Street
       New York, NY 10013
       By:  Kenneth Kimerling, Esq.

       LATINO JUSTICE/PRLDEF
       99 Hudson Street
       New York, NY 10013
       By:  Jackson Chin, Esq.

       SHEARMAN & STERLING LLP
       599 Lexington Avenue
       New York, NY 10002
       By:  Adam J. Goldstein, Esq.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-18-18

Attorneys for Defendants

LARSEN ADVOCATES P.C.
104 1ST Place
Brooklyn, NY 11231
By:  Kristian Karl Larsen

McCALLION & ASSOCIATES LLP
100 Park Avenue, 16th Floor
New York, New York 10017
By:  Kenneth F. McCallion, Esq.

**Sweet, D.J.**

Plaintiffs Tae H. Kim, Young M. Choi, Dong M. Ju, Hong S. Kim, Yoon C. Kim, Chul G. Park, Jin H. Park, Eutemio Morales, Zhe Y. Shen, Jong H. Song, and R. Julian Ventura (collectively, the "Plaintiffs") are judgment creditors from a previously adjudicated Fair Labor Standards Act litigation, Kim v. Kum Gang, Inc., No. 12 Civ. 6344 (MHD) (S.D.N.Y.) (the "FLSA Action"). Plaintiffs have alleged that one of the FLSA Action judgment debtors, Defendant Ji Sung Yoo ("Ji Sung"), violated fraudulent conveyance sections of the New York Debtor and Creditor Laws ("DCL") when he transferred real property interests to members of his family, Defendants Sandra Yoo ("Sandra"), Samuel Yoo ("Samuel") and Carolyn Yoo ("Carolyn") (collectively, the "Yoos" or the "Defendants") in an attempt to avoid paying debts.

A bench trial in this action was held before the Court between January 22 and January 30, 2018. Based upon the prior proceedings, the findings of fact, and conclusions of law set forth below, Plaintiffs have proven that each property interest Ji Sung transferred was fraudulent conveyed and entitled to be set aside. Plaintiffs are further entitled to a money judgment to satisfy mortgages taken out on two of the properties from the

1

transferees of those property, in addition to certain attorneys'
fees as against Ji Sung and Sandra.

## I. **Prior Proceedings**

On April 21, 2015, Plaintiffs filed their complaint. Dkt.
No. 1. Plaintiffs' complaint alleged that Ji Sung fraudulently
conveyed three pieces of property—a home in Little Neck, New
York (the "Home"), a condominium on Fifth Avenue in Manhattan,
New York (the "Condo"), and a commercial property in the
Sheepshead Bay neighborhood of Brooklyn, New York (the "Brooklyn
Property")—to Sandra, Samuel, and Carolyn. See Compl. ¶¶ 35-45.
Invoking the Court's ancillary enforcement jurisdiction to
secure payment on a judgment award of $2,672,657.30 entered
against Ji Sung and for Plaintiffs in the FLSA Action,
Plaintiffs sought to return the alleged fraudulently conveyed
property interests to Ji Sung's estate and require payment for
mortgages taken out on the Home and Brooklyn Properties to
return those properties to their pre-conveyance value. Compl.
¶¶ 2, 7, 38, 42, 45. Plaintiffs also sought attorneys' fees and
costs. Compl. ¶¶ 38, 42, 45.

On September 15, 2015, Defendants moved to dismiss
Plaintiffs' Complaint, Dkt. Nos. 28, 35, which was denied on
January 19, 2016, Dkt. No. 57. On June 20, 2017, Defendants
moved for summary judgment, Dkt. No. 85, which was denied on
September 29, 2017, Kim v. Ji Sung Yoo, No. 15 Civ. 3110 (RWS),
2017 WL 4382078 (S.D.N.Y. Sept. 29, 2017) ("Summary Judgment
Opinion"). During motion practice on Defendants' summary
judgment motion, Plaintiffs stated they no longer intended to
pursue Section 276 intentional fraud claims against Carolyn or
Samuel. Dkt. Nos. 95, at 20 n.22; 107, at 9 n.8.

Evidence was presented between January 22 and January 30,
2018. Final arguments were held on March 28, 2018, at which
point the matter was marked fully submitted.

## II. **Findings of Fact**

Three witnesses testified at trial: Ji Sung, Sandra, and
Kang Youl Lee ("Lee"), the Yoos' financial accountant. Tr.
24:25-7.[1] Their testimony is found generally to be self-serving
and unreliable. In particular, Sandra and Lee's inconsistent and

---

[1]    Citations to "Tr." refer to the transcript of the trial
held in this matter from January 22 and January 30, 2018, and
any exhibits referenced therein.

3

often unsupported accounts offer limited corroboration to Ji Sung's version of events, which is described in greater detail following a brief reflection of Sandra and Lee's testimony.

Sandra's testimony seismically shifted over the course of the litigation and appeared crafted after her deposition to support Defendants' trial posture. This was evident during her testimony regarding the many checks written by and to the Yoos that she claimed supported fair consideration for the disputed property conveyances. E.g., compare Tr. 228:22-23 (stating at trial that she wrote a check to pay the Kum Gang rent), and Tr. 312:1-19 (stating at trial that she had made a copy of a check before giving it to Kum Gang), and Tr. 229:8-230:17 (stating at trial that she wrote a check to Kum Kang), and Tr. 245:24-246:10 (stating at trial that many of the checks given to Ji Sung's restaurants were her friends who wrote out checks at her request), with Tr. 283:8-284:8 (stating at her deposition that the check described at Tr. 228:22-23 was given to her by an acquaintance and not at her request), and Tr. 314:21-22 (stating at her deposition that the check described at Tr. 312:1-19 was obtained from Kum Gang), and Tr. 288:22-289:15 (stating at her deposition that the check described at Tr. 229:8-230:17 was given to her by her brother-in-law), and Tr. 319:10-16, 324:19-

4

21, 327:4-6, 328:3-9, 329:9-13, 330:12-16 (stating at trial that
the checks described at Tr. 245:24-246:10 in general were not
friends, but rather employees, and that her brother-in-law had
done the soliciting). Of particular note, Sandra had no
believable explanation for how checks she stated had come only
from her account had been altered to cover-up that the checks
had actually come from her joint account with Ji Sung. See Tr.
230:18-232:14, 292:10-11, 293:19-25; Defs.' Ex. B, at 7, 8;
Pls.' Exs. 70-71. Sandra's responses to straight-forward
questions about whether money went from Kum Gang to her
restaurant, Gum Gang, when other uncontroverted evidence
demonstrated that fact, evinced an intention to avoid contrary
facts for the sake of Ji Sung's narrative. See Tr. 306:13-16,
357:8-11; Pls.' Exs. 50-55.

Lee's testimony was similarly wavering and unreliable. Like
Sandra, Lee's testimony as to where money from Ji Sung's
restaurants came from, went to, and for what purposes shifted
over the course of trial. Lee sometimes stated that certain
monies went to Sandra, only to later refuse to state with the
same confidence that he knew anything about the same checks.
Compare Tr. 33:5-11, 34:2-10 (stating that certain ledger
entries for Ji Sung's restaurants demonstrated checks that went

to Sandra), with Tr. 34:23-24, 35:11-14 (stating there was no way to know if certain check payments went to Sandra). Lee's testimony was equivocal as to why certain ledger entries for Ji Sung's restaurants reflected payment to Sandra as payroll or as repayment for loans Sandra made. Compare Tr. 71:2-25 (stating that the checks were for payroll), with Tr. 82:19-83:3 (stating that the checks were for loan repayment, not payroll). The manner in which Lee described the accounting of Ji Sung's restaurants to which he testified at trial indicated that the records were made one way and then, later, changed based on ex post direction from Ji Sung and Sandra. Tr. 50:15-53:5, 55:8-63:16.

In addition to the aforementioned witness testimony, the parties submitted documentary evidence at trial, including New York State Department of Labor (the "DOL") records, checks written by and given to the Yoos, the facts subject to preclusive effect based on prior findings in the FLSA Action[2],

---

[2]     The Honorable Michael H. Dolinger's detailed Memorandum and Order, resolving FLSA claims brought in 2012 against Ji Sung and other managers of Kum Kang and Kum Gang, was entered into evidence as Plaintiffs' Exhibit 1. Kim v. Kum Gang, Inc., No. 12 Civ. 6344 (MHD), 2015 WL 2222438 (S.D.N.Y. Mar. 19, 2015). Plaintiffs rely on factual findings from the FLSA Action to support their instant claims.

and prior sworn declarations and affidavits submitted over the course of this proceeding. Having considered them all, this evidence established the following facts.

Ji Sung and Sandra, husband and wife, have four children: Carolyn, Samuel, Sue, and June. Tr. 111:9-11, 181:19-182:23.

---

"Collateral estoppel 'will bar the relitigation of an issue of law or fact that was raised, litigated, and actually decided by a judgment in a prior proceeding between the parties, if the determination of that issue was essential to the judgment, regardless of whether or not the two proceedings are based on the same claim.'" McGuiggan v. CPC Int'l, Inc., 84 F. Supp. 2d 470, 477-78 (S.D.N.Y. 2000) (quoting N.L.R.B. v. United Techs. Corp., 706 F.2d 1254, 1260 (2d Cir. 1983). "In the context of issue preclusion, an issue can be one of fact or of law." Klein v. City of N.Y., No. 10 Civ. 9568 (PAE) (JLC), 2011 WL 5248169, at *6 (S.D.N.Y. Oct. 28, 2011) (internal quotation marks, alterations, and citation omitted), report and recommendation adopted, 2012 WL 546786 (S.D.N.Y. Feb. 21, 2012). "For issue preclusion to apply, a prior court need not have expressly decided the identical issue being litigated in a subsequent case; so long as the prior court decided that issue by necessary implication, the issue preclusion rule is satisfied." Id. (internal quotation marks, alterations, and citation omitted). "Trial courts have broad discretion in deciding when to permit the offensive use of collateral estoppel." Wills v. RadioShack Corp., 981 F. Supp. 2d 245, 264 (S.D.N.Y. 2013).

Issue preclusion is appropriate here. The issues presented both in the FLSA Action and here are substantially similar, those issues were as necessary to that resolution as to this one, the issues in the FLSA Action were actually litigated to judgment by these Plaintiffs and Ji Sung, and the FLSA Action was fully and fairly litigated. Further support for preclusion is found by the fact that Defendants themselves rely upon the FLSA Action in their motion papers. See Defs.' Post-Trial Mem. ("Defs.' Mem.") at 1, 14, 18, 24.

Sandra is principally at home and cares for June, who is disabled and requires twenty-four hour care. Tr. 111:20-25; 182:12-19. The Yoos, in differing ownership arrangements, own three properties: the Home, located at 52-32 Leaf Place, Little Neck, New York, Tr. 126:6-7; the Condo, located at 325 Fifth Avenue, Manhattan, New York, Tr. 119:22-25; and the Brooklyn Property, located on Avenue U, Brooklyn, New York, Tr. 127:10-12.

For the past twenty-six years, Ji Sung has owned two Korean restaurants in New York City: Kum Gang, Inc. ("Kum Gang"), in Flushing, Queens, and Kum Kang, Inc. ("Kum Kang"), in Midtown Manhattan, and during the time period at issue, he was the sole owner.[3] Tr. 112:1-12, 112:24-113:20, 124:17-21, 138:19-20; Pls.' Exs. 1 ("FLSA Op."), at 4, 28-31. As an owner and manager, Ji Sung "maintain[ed] close control over their operations," FLSA Op., at 4, and the two restaurants operated with similar personnel and management practices and policies, Tr. 139:2-8. Ji Sung purchased the restaurants, in part, by using a $1 million inheritance the family received from Sandra's parents at the

---

[3] Sandra has a restaurant, Gum Gang, as well, which was founded in August 2012. See, e.g., Tr. 154:18-25, 157:10-12, 165:24-166:7, 380:18-20. How Sandra was able to operate a restaurant while also caring full-time for June was never explained or delved into at trial.

8

time of Ji Sung and Sandra's wedding. Tr. 124:22-125:2, 358:19-359:3.

The nature of the inheritance was contested at trial. Both Ji Sung and Sandra testified that Sandra exclusively inherited the $1 million, who in turn loaned it to Ji Sung to open his businesses. Tr. 125:3-5; 181:3-10, 187:18-20; 359:14-360:15. The contention that Ji Sung and Sandra's marriage had a transactional component to it is belied by other evidence in the record, however. Most importantly, Sandra sworn previously that the $1 million was given by her family specifically to Ji Sung for his business endeavors. See Affidavit of Sandra Yoo dated June 17, 2017 ("Sandra Aff.") ¶ 2, Dkt. No. 85, Ex. E. Other evidence showed that Ji Sung and Sandra only split their finances following Ji Sung's business problems, Tr. 362:16-21, and other shared joint bank accounts, Tr. 296:5-8, 364:12-365:10, 369:5-370:10. This evidence establishes that the two shared undifferentiated finances. Sandra described her relationship with her husband as "not a business relationship between husband and wife." Tr. 361:2. The wedding inheritance money literally could have been given to Sandra, see Tr. 359:24-360:1, but the evidence established that the money was given to

9

the Yoos as a couple, and that it was spent in large part on the restaurants.

In January 2010, the DOL began investigating Kum Kang (the "2010 KK Investigation"). Pls.' Ex. 6A. The investigation reviewed Kum Kang's payroll records from July 1, 2005, through February 11, 2010. Id., at 18. Ji Sung averred at trial that he was unaware of this investigation, Tr. 176:8-9, but that claim is countervailed by other evidence. Ji Sung was aware at the time that he was in violation of applicable labor laws. See FLSA Op. 83-85 & n.54 (describing the actions taken by Ji Sung and other FLSA Action defendants to conceal their unlawful employment practices and concluding that the "defendants' violation of the applicable [labor] laws was certainly willful"). Ji Sung was also aware of the DOL's investigation, as evidenced by his involvement in early 2010 with manufacturing false time cards. See FLSA Op. 50, 52-53, 60, 74, 83 & n.36 (describing the defendants' creation of false time cards during the 2010 KK Investigation in the home of a relative of Ji Sung's while Ji Sung hid the real time cards in his home garage).

This was not Ji Sung's first encounter with DOL investigations. In 2007, following an investigation begun in

January 2005, the DOL had fined Ji Sung for failing to pay his employees properly or to maintain proper payroll records. FLSA Op. at 83 n.54; Tr. 115:11-14. The DOL initially fined Ji Sung around $168,000 in actual damages, which with penalties could have amounted to over $1 million, but ultimately settled with him for $137,000 in damages. Tr. 115:15-116:18, 172:16-173:7; FLSA Op. at 83 n.54.

On March 10, 2010, Ji Sung, who had a half interest in the Condo shared with Carolyn, conveyed one-third of that interest to Sandra. Pls.' Ex. 8; Tr. 195:10-13. The conveyance deed for the Condo stated there was consideration of ten dollars but also that the full sale price was for zero dollars. Pls.' Ex. 8, at 3, 9. The Condo had been appraised at $1.275 million on February 2, 2010. Ex. 9, at 4. At this time, the Condo's mortgage was refinanced, amounting to $729,750, for which Ji Sung maintained joint and several liability. Pls.' Ex. 10, at 3-5 (stating that if multiple individuals signed the agreement as "Borrower" that each is "fully and personally obligated to keep all of Borrower's promises"); see also Tr. 120:1-121:7.

In November 2010, the DOL commenced a second investigation into Ji Sung's restaurants, this time Kum Gang (the "2010 KG

Investigation"). Pls.' Ex. 6B. The investigation reviewed Kum
Gang's payroll records from February 19, 2009, through November
21, 2010. Id., at 2. Ji Sung was aware of this investigation and
similarly aware that the restaurant was engaged in labor law
violations. See Tr. 139:2-6 176:2-19; Pls.' Ex. 6B, at 2; FLSA
Op., at 85.[4]

Records demonstrated that Ji Sung's restaurants were not
financially lucrative in 2010. That year, Kum Kang had a total
income of $1,147,975, but the restaurant's operating expenses
and other deductions reduced its taxable income to a loss of
$208,098.[5] Pls.' Ex. 31. Similarly, while Kum Gang had a total
income of $2,324,559, the restaurant's taxable income was
$101,772. Pls.' Ex. 28.[6] In 2010, Kum Gang had book value assets
amounting to $800,000 and liabilities of $287,310, while Kum
Kang had book value assets amounting to $725,128 and liabilities
of $191,178. See Pls.' Exs. 28, at Sch. L, 31, at Sch. L.

---

[4]    At a different point in his testimony, Ji Sung stated he
first learned that Kum Gang was being investigated by the DOL in
2015. Tr. 131:24-132:12. This account is not believed.

[5]    Kum Kang also had net operating losses in 2009 that totaled
$149,237. Pls.' Ex. 31, at 10.

[6]    At trial, Ji Sung represented that in 2010 and 2011, his
restaurants were, combined, valued at around $2 million. Tr.
114:12-14. There was no additional support for this assessment,
and the claim is given no weight.

On February 10, 2011, the DOL wrote Ji Sung to inform him
that, as a result of the 2010 KK Investigation, he owed
underpayments and damages amounting to $1,176,208.30. Defs.' Ex.
J, at 659. Over the course of the month, Kum Kang employees and
the DOL adjusted the underpayment computations following
additional provided documentation, ultimately reducing the owed
total to $694,966.41 on March 11, 2011; at that time, the DOL
stated that that revised restitution amount would be final, with
no further negotiations, subject to the maximum penalties
permitted, and that three additional cited violations would be
added. See Defs.' Ex. J, at 66-68 (detailing the DOL
investigator's final report); Tr. 118:5-12 (explaining that the
DOL originally tried to fine Ji Sung "over $2 million," but that
the negotiation ended "around $600,000"). On March 16, 2011, Ji
Sung, through his and Kum Kang's counsel, informed the DOL that
he could not pay the assessed restitution amount, was
uninterested in discussing a payment plan, and continued to
believe the assessed amount was incorrect. Defs.' Ex. J , at 64,
68; see Tr. 119:1-9, 128:23-129:3.

On April 22, 2011, as a result of failing to pay the 2010
KK Investigation's assessed restitution, the DOL issued Ji Sung

13

an Order to Comply to pay damages totaling $1,950,992.84 (the

"2010 Order"). Pls.' Ex. 6A, at 2. Specifically, the DOL

determined that Ji Sung owned: $555,973.03 in owned

underpayments; $144,080.37 in interest (assessed at 16%)[7];

$138,993.38 in liquidated damages (25% of wage damages)[8]; and

$1,111,946.06 in civil penalties (200% of wage damages)[9]. Id.

That same day, the DOL issued a second Order to Comply against

---

[7] Interest was included, and the applicable rate proscribed, pursuant to N.Y. LAB. LAW § 219(a) (McKinney 2011) (directing that if the Commissioner determines that wages are due, then the order directing payment shall include "interest at the rate of interest then in effect as prescribed by the superintendent of financial services pursuant to section fourteen-a of the banking law per annum from the date of the underpayment to the date of payment").

[8] Liquidated damages were assessed pursuant to N.Y. LAB. LAW § 198 (McKinney 2011) (directing that "the commissioner may assess against the employer an additional amount as liquidated damages equal to twenty-five percent of the total amount of wages found to be due, unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law").

[9] On April 1, 2011, civil penalties were assessed at 200% of the wage damages because, in part, Ji Sung was a previous DOL labor law offender. See Defs.' Ex. J, at 92; see also N.Y. LAB. LAW § 218 (McKinney 2011) (emphasis added) (directing that if a Commissioner determines wages are due, "[i]n addition to directing payment of wages, benefits or wage supplements found to be due, such order, if issued to an employer who previously has been found in violation of those provisions, rules or regulations, or to an employer whose violation is willful or egregious, shall direct payment to the commissioner of an additional sum as a civil penalty in an amount equal to double the total amount found to be due").

14

Ji Sung totaling $6,000 in civil penalties for additional labor law violations. Defs.' Ex. J, at 60.

On June 10, 2011, Ji Sung appealed the 2010 Order to the New York State Industrial Board of Appeals (the "IBA"). Defs.' Ex. J, at 98-99. In his Petition for Review, Ji Sung stated that the Order was unreasonable because it was "based on erroneous figures provided by an accountant who has since recanted his submissions . . . [s]ince the figures upon which the Order was based are erroneous[,] that makes the findings . . . erroneous as well." Id. at 98. Ji Sung calculated that he owed "probably about 10% of what was assessed." Id.

On November 16, 2011, Ji Sung made two conveyances, both to Sandra and Samuel. First, Ji Sung, who jointly owned the Home with Sandra, conveyed his half interest in the Home to Sandra and Samuel. Pls.' Ex. 11; Tr. 126:21-25. The conveyance deed for the Home stated there was consideration of ten dollars but also that the full sale price was for zero dollars. Pls.' Ex. 11, at 4, 8. The Home was appraised at $770,000 on December 21, 2011. Ex. 9, at 2. Second, Ji Sung conveyed his full interest in the Brooklyn Property, also to Sandra and Samuel. Pls.' Ex. 15; Tr. 127:13-17. The conveyance deed for the Brooklyn Property stated

15

there was consideration of ten dollars but also that the full sale price was for zero dollars. Pls.' Ex. 15, at 4, 8. The Brooklyn Property was appraised at $1.1 million on July 27, 2012. Pls.' Ex. 16, at 6. As part of his 2011 federal gift tax report, Ji Sung listed the conveyances of the Home and Brooklyn Property. Pls.' Ex. 36. At the time of Home and Brooklyn Property conveyances, Sandra was aware that Ji Sung had a "desperate need of money . . . because of the restaurant." Tr. 207:11-19. Ji Sung continued to reside in the Home following the transfer of his interest. See Tr. 199:21-201:10.

Ji Sung's restaurants were again not lucrative in 2011. That year, Kum Kang had a total income of $1,519,696, but the operating expenses and other deductions reduced the restaurant's taxable income to $0. Pls.' Ex. 32. Similarly, Kum Gang had a total income of $2,159,818, but the restaurant's taxable income was $22,616. Pls.' Ex. 29. The restaurants' tax returns also show that Kum Gang had book value assets amounting to $1,053,782 and liabilities of $526,023, while Kum Kang had book value assets amounting to $742,990 and liabilities of $165,111. See Pls.' Exs. 29, at Sch. L, 32, at Sch. L.

16

A part of Defendants' position has been that Ji Sung conveyed each of the properties for the purpose of mortgaging or refinancing the mortgages of the properties under Sandra's name; their alleged theory is that Sandra possessed better credit, and that the money received from those mortgages were given to Ji Sung, used by his restaurants, and counted as consideration for the property conveyances. See, e.g., Tr. 120:11-121:4, 127:18-128:2, 143:22-24, 148:23-148:17. Ji Sung and Sandra both claimed that Sandra controlled the mortgage money, which was given to Ji Sung upon need and request. See, e.g., Tr. 144:16-20, 150:6-152:5. The parties put into evidence many checks going between Ji Sung, Sandra, others, and their respective restaurants, mostly from the 2013-2015 time range. See Defs.' Exs. B, F; Pls.' Exs. 22-26, 50-55.

The totality of the checks adduced do not establish payments made by Sandra to Ji Sung for any of the contested conveyances; moreover, by themselves, the checks barely establish anything at all. The mortgage proceeds from the Home and Brooklyn Property went into accounts at Nara Bank and Flushing Savings Bank, respectively, and totaled $950,000. Pls.' Exs. 14, 17, 37; Tr. 306:24-307:11. However, no checks were written from Nara Bank to Ji Sung or his restaurants, see Pls.'

17

Ex. 37; Defs.' Exs. B, F; Tr. 379:4-380:24, and only one check from Flushing Savings Bank for $210,000 went to the same, Defs.' Ex. B, at 5; Tr. 307:15-19.

Testimony varied widely as to the purpose of different checks, and the given or possible reasons were often having nothing to do with the contested properties. See, e.g., Tr. 345:8-21 (stating that a check written to Bank of America was to repay a loan made to Kum Gang that could have been used "in purchasing things at the supermarket"); Tr. 356:11-13, 357:8-12 (explaining how repayment was needed because Ji Sung had "opened the line of credit, however that loan was for me [Sandra], so I had to pay the money back"); Tr. 232:9-12, 323:21-324:12 (collecting money lent to Kum Gang from friends and family to keep the restaurant open with the expectation of being "paid back by the restaurant"). In addition to cash flow into Ji Sung's restaurants, checks also demonstrate that a substantial amount of money flowed from Kum Gang and Kum Kang to Sandra and Gum Gang, amounting to over a $1 million and more than the amount given by Sandra to Ji Sung and his restaurants during the same time period. See Pls.' Exs. 22-26, 50-55.

Evidence was adduced that undermines the legitimacy of some of the check evidence. On multiple occasions, Sandra testified that checks came from her personal account and were cut to support Ji Sung's restaurants. See Tr. 228:22-23, 230:18-232:14. However, as noted above, it was later shown that the checks initially proffered by Sandra were in fact altered to mask that the checks had either come from Ji Sung or their joint bank account. Compare Defs.' Ex. B, at 6-8, and Defs.' Ex. F, at 7, and Tr. 351:5-13, with Pls.' Exs. 69-72. No credible explanation for these alterations was provided. Moreover, as also described above, Sandra's testimony as to how she acquired many of the checks, whether personally or from family members, varied between her trial and deposition testimony. See, e.g., Tr. 229:8-230:17, 283:4-7, 288:22-289:15, 328:6-329:13, 330:1-16, 331:4-332:7, 333:10-22, 334:17-21.

Taken all together, these checks demonstrate only that a large amount of money was regularly shuttled between different individuals, the Yoos, and their restaurants. What they and the adduced testimony do not establish by a preponderance is any other fact about them, including the purposes of any given check or who ultimately received it.

It was not established that Sandra was aware of the details of her husband's restaurant operations or financial situation, but clear and convincing evidence established that she was aware that Ji Sung and his restaurants had concerning financial problems and that he was regularly borrowing money to keep his restaurants in business. Tr. 207:11-19, 212:23-214:21. Sandra knew enough about Ji Sung's fiscal straits to decide she wanted to take his name off of family property to protect those assets and to split apart their joint bank accounts into individual accounts. Tr. 362:16-21, 374:2-375:25.

The events of principal significance in this action took place in and around the 2010 and 2011 conveyances, but additional events are material to the conclusions reached.

On February 2, 2012, Sandra and Samuel conveyed one-third of their combined interest in the Home to Carolyn. Pls.' Ex. 13.

In May 2012, a mortgage was taken out on the Home with Sandra, Carolyn, and Samuel's names on it, in the amount of $500,000, and for which each is joint and severally liable. Pls.' Ex. 14.

On August 20, 2012, Plaintiffs commenced their FLSA Action
against Ji Sung, Kum Gang, and others in the Southern District
of New York. FLSA Action Dkt. No. 1; Tr. 132:6-133:5.

On January 2013, a mortgage was taken out on the Brooklyn
Property with Sandra and Samuel's names on it, in the amount of
$450,000, and for which each is joint and severally liable.
Pls.' Ex. 17.

On February 27, 2014, the IBA upheld the DOL's 2010 Order
in its entirety. See Matter of Ji Sung Yoo & Kum Kang Inc. (T/A
KumGangSan) v. The Comm'r of Lab., IBA Docket No. PR 11-174,
available at http://industrialappeals.ny.gov/decisions/pdf/pr-
11-174.pdf. Ji Sung testified at the IBA's hearing, but
instructed his attorney not to attend. See id. at 2.

On March 20, 2014, the DOL wrote Ji Sung to inform him
that, as a result of the 2010 KG Investigation, he owed
underpayments and damages amounting to $282,885.38, and an
additional $3,000 in civil penalties for additional labor law
notice violations. Pls.' Ex. 6B, at 2-3. On June 20, 2014, as a
result of failing to make the 2010 KG Investigation's required
restitution payment, the DOL issued an Order to Comply to Ji

21

Sung pay damages amounting to $646,080.49. Pls.' Ex. 6B, at 5. Specifically, the DOL determined that Ji Sung owned: $226,128.23 in owned underpayments; $137,291.88 in interest (assessed at 16%); $56,532.15 in liquidated damages (25% of wage damages); and $226,128.23 in civil penalties (200% of wage damages). Id. That same day, the DOL also issued Ji Sung two additional Orders to Comply: one for $511.92 for underpaid wages, interest, damages, and civil penalties for a single additional employee, and $3,000 for failure to maintain proper payroll records. Id. at 14, 16.

In August 2014, the DOL visited Kum Gang as part of an investigation into the payroll records from June 2011 to August 2014. Pls.' Ex. 6C, at 8. The investigation ultimately resulted in the DOL assessing unpaid wages, unlawful deductions, interest, liquidated damages, and penalties amounting to $2,101,295.19. See Pls.' Ex. 6C, at 18, 22, 24.

By the time of the instant trial, the FLSA Action was concluded, resulting in a final judgment of $3,449,516.90 plus post-judgment interest against Ji Sung and in favor of Plaintiffs. See FLSA Action, Dkt. Nos. 143, 160, 172. Only $312,763 of the judgment has been paid as part of Kum Gang's

Chapter 11 plan of reorganization. Tr. 139:17-140:5; see In re
Kum Gang Inc., No. 15-42018 (CEC) (Bankr. E.D.N.Y.).


## III. **Conclusions of Law**

Plaintiffs have argued that three different sections of the
New York Debtor and Creditor Laws were violated by each of Ji
Sung's three real property conveyances. First, the three DCL
sections will be discussed. Then, each property conveyance will
be considered, chronologically, under each DCL section.
Subsidiary considerations like the repayment of incurred
property depreciation and awarding of attorneys' fees and costs
will follow.


### a. Applicable Laws

DCL §§ 273, 275, and 276 define different types of
conveyances by a debtor that become recoverable by creditors
because the conveyances' fraudulent nature. These conveyances
fall into two distinct categories: constructively fraudulence
conveyances, such as DCL §§ 273 and 275, and actually fraudulent
conveyances, as defined by DCL § 276. See, e.g., Drenis v.
Haligiannis, 452 F. Supp. 2d 418, 428-29 (S.D.N.Y. 2006)

(outlining requirements for stating claims under DCL Sections 273, 275, and 276). The burden of proof for constructive fraud claims is preponderance of the evidence. See, e.g., In re Chin, 492 B.R. 126 (Bankr. E.D.N.Y. 2013); Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 376 & n.6 (S.D.N.Y. 2003) (citation omitted), aff'd, 99 F. App'x 274 (2d Cir. 2004) (summary order). The burden of proof for fraudulent intent for an actual fraud claim is clear and convincing evidence. See, e.g., HBE Leasing Corp. v. Frank, 48 F.3d 623, 639 (2d Cir. 1995).

DCL Section 273 provides that: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law § 273. The Second Circuit has instructed that a conveyance is "deemed constructively fraudulent" under DCL Section 273 only if "two separate elements are satisfied: first, it is made without fair consideration, and second, the transferor is insolvent or will be rendered insolvent by the transfer in question." United States v. Watts, 786 F.3d 152, 164 (2d Cir. 2015) (internal quotation marks omitted) (quoting In re Sharp Int'l Corp., 403 F.3d 43, 53 (2d Cir. 2005)). Constructive

fraudulent conveyance under DCL Section 273 is "defined exclusively by the objective conditions of the asset transfer at issue, without regard to the debtor's intent in making the transfer." Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 126 F. Supp. 3d 388, 400 (S.D.N.Y. 2015), aff'd, 2017 WL 5499156 (2d Cir. Nov. 16, 2017). "[T]he element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." Watts, 786 F.3d at 165 (citations omitted); see also Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp., 792 F. Supp. 2d 645, 651 (E.D.N.Y. 2011).

DCL Section 275 similarly provides that: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 275. Under DCL Section 275, a "plaintiff must allege both a 'lack of fair consideration' and that 'the Defendant intended or believed that it would incur debts beyond its ability to pay when the debts matured.'" City of Almaty v. Ablyazov, 278 F. Supp. 3d 776, 798 (S.D.N.Y. 2017) (quoting SungChang Interfashion Co.,

25

Ltd. v. Stone Mountain Accessories, Inc., No. 12 Civ. 7280
(ALC), 2013 WL 5366373, at *10 (S.D.N.Y. Sept. 25, 2013)).

As relevant to DCL Sections 273 and 275, "fair
consideration" is defined by DCL Section 272, which provides:

> Fair consideration is given for property, or
> obligation: (a) When in exchange for such property, or
> obligation, as a fair equivalent therefor, and in good
> faith, property is conveyed or an antecedent debt is
> satisfied, or (b) When such property, or obligation is
> received in good faith to secure a present advance or
> antecedent debt in amount not disproportionately small
> as compared with the value of the property, or
> obligation obtained.

N.Y. Debt. & Cred. Law § 272. "[F]air consideration has two
components—the exchange of fair value and good faith—and
both are required." In re Khan, No. 10 Civ. 46901 (ESS),
2014 WL 10474969, at *8 (E.D.N.Y. Dec. 24, 2014) (quoting
SEC v. Universal Exp., Inc., 2008 WL 1944803, at *5
(S.D.N.Y. Apr. 30, 2008)). "[I]n most cases, the repayment
of an antecedent debt is made for fair consideration." Am.
Federated Title Corp., 126 F. Supp. 3d at 401 (citing HBE
Leasing, 48 F.3d at 639). "In the case of an intra-family
transfer, the burden of proving the lack of fair
consideration . . . shifts to the transferee." Perrone v.
Amato, No. 09 Civ. 316 (AKT), 2017 WL 2881136, at *32
(E.D.N.Y. July 5, 2017) (citations omitted). While fair

26

consideration "does not require dollar-for-dollar equivalence," fair consideration cannot be "disproportionately small . . . compared to the value of the transferred property." Lippe, 249 F. Supp. 2d at 377.

Under DCL Sections 273 and 275, a debtor is considered insolvent when the "present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law § 271. "To determine insolvency, courts apply a 'balance sheet' test—*i.e.*, whether the debtor's debt exceeds his salable assets. Accordingly, a party is not insolvent just because he cannot pay his debts as they become due." In re Chin, 492 B.R. at 127 (internal citations omitted). "The operative reference point for determining insolvency is the time at which the transfer took place" and "insolvency of the transferor . . . cannot be presumed from subsequent insolvency at a later point in time." O'Toole v. Karnani (In re Trinsum Group, Inc.), 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011). "[O]nly assets with a present salable value are taken into consideration in determining insolvency. Claims that are inchoate, uncertain, and contested have no present value and cannot be considered an asset of the

[transferor]." McCarthy v. Estate of McCarthy, 145 F. Supp. 3d 278, 286 (S.D.N.Y. 2015) (second alteration in original) (quoting First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc., 871 F. Supp. 2d 103, 120 (E.D.N.Y. 2012)). Debt, on the other hand, "includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt. & Cred. Law § 270.

DCL Section 276 provides that: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. Unlike DCL Sections 273 and 275, under DCL Section 276, a transferor does not need to receive fair consideration for a conveyance to be fraudulent. See MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (citing HBE Leasing, 48 F.3d at 639); see also In re Sharp, 403 F.3d at 56 ("Where actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given."). Rather, under Section 276 a creditor must show "intent to defraud on the part of the transferor" to prevail. In re Sharp, 403 F.3d at 56.

However, because proving "[a]ctual intent [under DCL Section 276] is difficult to establish through direct evidence . . ., the relevant intent may be inferred from the facts and circumstances surrounding the transfer." S.E.C. v. Smith, 646 F. App'x 42, 45 (2d Cir. 2016) (summary order) (quoting In re Cassandra Grp., 312 B.R. 491, 497 (Bankr. S.D.N.Y. 2004)). These so-called "badges of fraud" are facts and circumstances "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." In re Sharp, 40 F.3d at 56 (quoting Wall St. Assocs. v. Brodsky, 684 N.Y.S.2d 244 (1st Dep't 1999)). Badges are similar to the considerations for DCL Section 275 and include:

(1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Ford Motor Credit Co. LLC v. Orton-Bruce, No. 14 Civ. 5382 (KMK), 2017 WL 1093906, at *9 (S.D.N.Y. Mar. 22, 2017) (citation omitted); see also In re Kaiser, 722 F.2d 1574,

1582–83 (2d Cir. 1983). Other badges sometimes included are whether it was a "secret and hasty transfer not in the usual course of business," the degree of "the transferor's knowledge of the creditor's claim and the transferor's inability to pay it," and "the use of dummies or fictitious parties" in the transfer. MFS/Sun Life Tr., 910 F. Supp. at 935. "Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference." MFS/Sun Life Tr., 910 F. Supp. at 935 (citations omitted).

"Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance." Cadle Co. v. Newhouse, 74 F. App'x 152, 153 (2d Cir. 2003); see also Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1172 (2d Cir. 1993) ("The New York Court of Appeals has made it clear that the pertinent provisions of the New York Debtor and Creditor Law provide a creditor's remedy for money damages against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance.").

b. The Condo

The first property conveyance contested by the Plaintiffs
is Ji Sung's transfer of one-third of his interest in the Condo
to Sandra on March 10, 2010. Plaintiffs contend that this
conveyance was fraudulently made under DCL Sections 273, 275,
and 276. There is no dispute that there was a conveyance. Each
DCL section will be addressed in turn.

Under both Sections 273 and 275, the inquiry starts at
whether there was fair consideration for the conveyance. Here,
there was not. From the conveyance documentation, it is of no
moment whether the amount listed as consideration is zero
dollars or ten dollars, as both are "disproportionately small"
when compared to an interest share that was worth approximately
$90,875, based on the proximately issued appraisal. Lippe, 249 F
Supp. 2d at 377; see also Deflora Lake Dev. Assocs., Inc. v.
Hyde Park, No. 13 Civ. 4811 (CS), 2016 WL 7839191, at *4
(S.D.N.Y. June 9, 2016) (finding a property conveyance listed
consideration of "ten dollars" not fair consideration), aff'd,
689 F. App'x 99 (2d Cir. 2017). Ji Sung was just as liable for
the Condo's mortgage after the refinancing as before the

conveyance, the documentation for which did not "unequivocally"
show that anyone "assume[d] and agree[d] to pay" the mortgage as
part of the consideration. McCombs, 30 F.3d at 327 (alterations
in original); see Pls.' Ex. 10, at 5. While myriad checks were
entered into evidence, their combined evidentiary weight does
not establish payment of consideration for the Condo, either as
antecedent debt or a present exchange. In the absence of fair
consideration, it is appropriate to apply an assumption of
insolvency, which becomes Defendants' burden to overcome. See
Watts, 786 F.3d at 165.

A back-of-the-envelope "balance sheet" calculation
indicates that, by conveying the Condo, Ji Sung was insolvent.
In re Chin, 492 B.R. at 127; see DCL § 271. Following the Condo
interest conveyance, based on valuations established at trial
and outlined above, Ji Sung retained ownership of the following
properties: one-third of the Condo, which after accounting for
the mortgage was worth around $181,750; fifty-percent ownership
in the Home[10], worth around $385,000; and complete ownership of

---

[10]     When parties own a property in the tenancy by the entirety,
the "separate interest of one spouse is subject to rights of the
co-owner . . . [therefore] we must value the debtor's interest
at something less that the interest of a single owner in fee
simple absolute." In re Bradigan, 501 B.R. 151, 154 (Bankr.
W.D.N.Y. 2013).

the Brooklyn Property, worth around $1.1 million.[11] The parties

have also put forward the tax returns for Ji Sung's restaurants

from 2010 and 2011 and dispute their relevance.[12] Alone, the tax

returns do not move the needle in establishing solvency, as

"[i]t is the fair saleable value of assets, not their book

---

[11]    Plaintiffs contend that the later appraisals of the Home
and Brooklyn Property should not be considered as the
properties' fair salable value in March 2010, the time of the
Condo's conveyance. While a valuation closer to the date of the
conveyance would be preferable, these are "sufficiently
contemporaneous" to establish salable value and calculate
solvency. In re Ford, 415 B.R. 51, 62 (Bankr. N.D.N.Y. 2009),
aff'd sub nom. Cmty. Bank, N.A. v. Ford, No. 09 Civ. 633 (GLS),
2009 WL 9540679 (N.D.N.Y. Dec. 8, 2009).

[12]    The parties' arguments as to the restaurants' tax returns
both seem to miss aspects of the returns. Defendants argue that
in 2010 and 2011 the restaurants had combined listed assets of
$1.5 and $1.8 million. See Pls.' Exs. 28-29, 31-32. As noted
above, however, a tax return book valuation of assets is not a
useful reflection of actual market value. Furthermore, it is
improper to look at a figure like assets in isolation without
accounting for any liabilities held by the restaurants at that
time. However, Plaintiffs' argument that the returns have an
equal amount of liabilities as assets on the tax return balance
sheets is unconvincing. To the extent there are comparable
values on the returns' Schedule L, it is a reflection of the
axiomatic accounting principle that, on a balance sheet, assets
must equal liabilities plus shareholders' equity. Plaintiffs do
not address the equity portion of the tax returns, which at
times is not an insignificant figure and which, as a sum
reflecting net income usually distributed as dividends, would be
Ji Sung's as the sole shareholder. See, e.g., Pls.' Ex. 28, at
2; id., at Sch. L (indicating retained earnings amounted to
$418,000, over half of the "Total liabilities and shareholders'
equity" section). In any event, dealing with any such showing of
actual salable value was Defendants' burden, not Plaintiffs',
and was not met.

33

value, that determines insolvency." Morgan Guar. Tr. Co. v. Hellenic Lines Ltd., 621 F. Supp. 198, 220 (S.D.N.Y. 1985) (citing Seligson v. NY Produce Exchange, 394 F. Supp. 125 (S.D.N.Y. 1975)); see also Kenyon & Kenyon LLP v. SightSound Techs., LLC, 58 N.Y.S.3d 298 (1st Dep't 2017) (affirming rejection of insolvency because evidence adduced "relied solely on the book value of assets and tax returns, and offered no evidence of the market ("salable") value of SST's assets").[13] Defendants provided no additional evidence to support any finding of the restaurants' "present salable value." DCL § 271. Therefore, Ji Sung's assets at the time of the Condo conveyance amount to approximately $1.67 million.

Calculating Ji Sung's liabilities requires separate analysis. Plaintiffs contend that totaling the damages ultimately found to be owned in wages, liquidated damages, and civil penalties by Ji Sung in the FLSA Action and various DOL Investigations, prorated to the time of the Condo conveyance, is

---

[13] Defendants argue that Lee's testimony as to Ji Sung's 2017 sale of certain ownership interest in Kum Gang demonstrates the market value of the restaurant. Defs.' Mem. 22-23; see Tr. 79:9-80:15. Even if such uncorroborated testimony was true, it is merely a useful indicator of the market value of Ji Sung's post-bankruptcy restaurant in 2017 and offers no probative evidence as to the pre-bankruptcy value of Kum Gang back in 2010.

greater than the assets assessed above. See Pls.' Mem. 13-14,

Dkt. No. 125. In support, Plaintiffs' principally rely on New

York Labor Law Section 191(1)(a), which provides that: "A manual

worker shall be paid weekly and not later than seven calendar

days after the end of the week in which the wages are earned . .

. ." N.Y. LAB. LAW § 191(1)(a) (McKinney 2011); see also Lanzetta

v. Florio's Enters., Inc., 763 F. Supp. 2d 615, 622 n.10

(S.D.N.Y. 2011) (citation omitted) ("A claim for unpaid wages

accrues on the date on which the employee should have been paid

for services rendered but was not."). As such, Plaintiffs aver,

the wage debts owed to Ji Sung's workers, later calculated by

Judge Dolinger and the DOL, were "existing debts" that are

calculable "probable liability" for Ji Sung. Lippe, 99 F. App'x

at 282 (quoting DLC Section 273). Plaintiffs' tabulation puts Ji

Sung's liabilities amounting to approximately $3.78 million at

the time of the Condo conveyance. Pls.' Mem. 14.


In response, Defendants argue that Section 271's "probable"

language needs to be read to mean that liabilities are assessed

by what Ji Sung himself reasonably believed he would have to pay

at that the time of conveyance. See Defs.' Mem. 20-21.

Defendants contend that reading a transferor's subjectivity into

Section 271 is "firmly established." Defs.' Post-Trial Reply

Mem. ("Defs.' Reply") 3, Dkt. No. 130. However, this argument is unavailing.

Defendants rely in their briefings and at oral argument on only one legal authority that is, at best, ambiguous in its support: the Honorable Denny Chin's district court opinion in Lippe. See Defs.' Mem. 6; Defs.' Reply 3. In Lippe, the court considered whether a debtor's conveyance of corporate assets in the face of asbestos personal injury lawsuits violated DCL Sections 273 and 276. Lippe, 249 F. Supp. 2d at 360. After reviewing the asbestos civil suits against the defendant, the court rejected a finding of insolvency, stating, in part, that "[n]o reasonable jury could find that [the debtor] actually believed its probable liabilities [from the asbestos lawsuits] would exceed the amount of . . . its other substantial assets." Id. at 379 (emphasis in original); see also id. at 381 ("Of course, it is what [the debtor] believed back in the 1980s, at the time of the transfers, that controls, not analyses performed now with the benefit of hindsight."). While these sentences from Lippe could be read to support Defendants' position, the court's analysis may relate to DCL Section 273 or 276. See id. at 377 (writing that "[t]he record does not contain sufficient evidence to permit a jury to find, either by a preponderance of the

36

evidence [DCL Section 273's standard] or by clear and convincing proof [DCL Section 276's standard], that [the debtor] was insolvent at the time of the transactions or payment of dividends or that [the debtor's] management believed that [it] was insolvent or on the verge of insolvency"). Moreover, more recent New York court opinions analyze insolvency without mention of a debtor's subjective understanding of her liabilities. See, e.g., Diebold Found., Inc. v. C.I.R., 736 F.3d 172, 190 (2d Cir. 2013) (finding insolvency under DCL Section 271 after corporate defendant sold assets and made a "liquidating distribution" without discussing the company's subjective perspective); Deflora Lake Dev. Assocs., Inc., 2016 WL 7839191, at *4 (rejecting finding of insolvency under DCL Section 271 because "Plaintiff has presented no evidence that the salable value of its assets suffices to pay its debts as they come due" without discussion of the defendant's perception of debt).

When Lippe was appealed to the Second Circuit, the court there presented plaintiffs' position differently: that plaintiffs' expert testimony was adduced below to show that the debtor defendant "should have estimated future [asbestos injury] case filings far in excess of the number it actually estimated"

and, therefore, was insolvent at the time of the conveyance. Lippe, 99 F. App'x at 282. The issue was not how the defendant viewed its liability, but rather how it should have viewed its liability.[14]

Reading Section 271 as having an objectively probable standard is consistent with the presence of DCL Section 275, which expressly grafts a subjectivity requirement onto the concept of insolvency. See DCL § 275. Were subjectivity already incorporated into the definition of insolvency under Section 271, it would be unnecessary to include it again in conjunctive provision. See Shelly v. Doe, 671 N.Y.S.2d 803, 806 (3d Dep't 1998) ("Section 275 is a constructive fraud provision which comes into play when a person making a conveyance without fair consideration intends or believes that he or she will incur debts beyond his or her ability to pay them as they mature.").

---

[14]  The Second Circuit ultimately rejected the plaintiffs' argument by resolving the issue in a different fashion. The court found that much of the asbestos lawsuit liability that plaintiffs argued the defendant should have calculated actually had not accrued under New York law because the majority of the claims were beyond the statute of limitations, therefore rendering it inapplicable to a DCL Section 271 calculation. See Lippe, 99 F. App'x at 282-83.

The question, therefore, is what Ji Sung's objectively probable liability on his existing debt at the time of the Condo conveyance. As found above, Plaintiffs have established that Ji Sung willfully violated wage laws under applicable labor codes at the time of the conveyance. Ji Sung's involvement in manufacturing false time cards establishes that he was aware of a DOL investigation into Kum Kang. It is therefore far from "entirely speculative," and, rather, probable, that Ji Sung would be required to pay liability for the wages he knew he was improperly paying that restaurant's employees based on these investigations. Shelly, 671 N.Y.S.2d at 806. Moreover, by the time of the conveyance, the Kum Kang wage debts to Ji Sung's employees had accrued and, therefore, are properly accounted as Ji Sung's liabilities. See Lippe, 99 F. App'x at 283 ("And because the estimates depend on unaccrued claims, they depend on amounts that are not 'debts' under the DCL."); Lanzetta, 763 F. Supp. 2d at 622 n.10 ("A claim for unpaid wages accrues on the date on which the employee should have been paid for services rendered but was not.").

However, although the DOL later made additional investigations—into Kum Gang, twice, see Pls.' Exs. 6B & 6C—and assessed penalties over the same period, and though those debts

39

had also accrued, there is no indication of an investigation had begun in March 2010. As such, it cannot be said that Ji Sung had probable liability in the context of the DOL on those debts at the time of the Condo's conveyance. It took the DOL investigating and assessing penalties and the FLSA Action entering a judgment to get Ji Sung to pay lawful wages; the evidence has not established that there was probability he would have been "required to pay" that liability absent those actions occurring. DCL § 271.

In addition to the owed waged, there is also the question of additional assessments levied by the DOL, such as interest, liquidated damages, and the civil penalty. See Pls.' Ex. 6A. These additions were probable liabilities because they were required under the DOL's assessment. Given the nature of Ji Sung's wage violations, it was probable under the statutory regime that Ji Sung would have to pay interest and liquidated damages. See N.Y. LAB. LAW §§ 198, 219(a) (McKinney 2011). At the time of the conveyance, the applicable labor law also proscribed a civil penalty of double the amount found to be due if the violator was a repeat offender; Ji Sung knew he would be a

repeat offender, having received a DOL penalty in 2007.[15] Ji Sung's probable and accrued liability from the KK 2010 Investigation alone amounts to $1.95 million, which is more than the $1.9 million that Defendants established as assets at trial. See Staten Island Sav. Bank v. Reddington, 687 N.Y.S.2d 707, 709 (2d Dep't 1999) (recognizing that probable liability can be found when "some evidence" is "proffered as to the probability, at the time of the challenged conveyance, that a contingent liability will be imposed and, if so, in what amount").


There is also the probable liabilities arising from claims in the FLSA Action. Simply because the "conveyance in the instant case occurred before any legal action was filed which would render . . . [Plaintiffs] a judgment creditor of Defendants does not necessarily preclude the constructive fraud claim." Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste

---

[15]  In its Summary Judgment Opinion, the Court indicated that it did not believe that the civil penalty assessed as part of the 2010 KK Investigation was probable. See Summ. J. Op. at *6 n.6. This revision has been required in part because, at that time, the Court did not have access to the fuller DOL files presented at trial that established that the civil penalty was assessed because Ji Sung was a repeat offender, rather than because Ji Sung failed to pay within a certain number of days. See Defs.' Ex. J, at 92. The obligatory nature of the civil penalty, as written and implemented by the DOL investigator, places this liability into the realm of the probable.

41

Sys., Inc., 255 F. Supp. 2d 134, 173 (W.D.N.Y. 2003). The
employees who brought the FLSA Action had creditor claims "as
soon as [their] cause of action accrue[d]." Bulkmatic Transp.
Co. v. Pappas, No. 99 Civ. 1207 (RBM) (JCF), 2001 WL 882039, at
*11 (S.D.N.Y. May 11, 2001) (collecting cases). Evidence adduced
as to Ji Sung's actions towards covering up the unpaid wages and
the restaurants' record-keeping of hours establish the
probability of the imposition of the contingent liability on Ji
Sung and the likely amount of that debt. Pfohl Bros., 255 F.
Supp. 2d at 174; see also Lippe, 99 F. App'x at 282-83
(considering debtor's potential lawsuit claims and rejecting as
liabilities only those claims that were unaccrued); Shelly, 671
N.Y.S.2d at 805 (finding defendant's conveyance of property
absent fair consideration and with awareness of potentially
incurring debt beyond ability to pay rendered conveyance
fraudulent). At the time of the Condo's conveyance, the FLSA
Court calculated that Ji Sung owed approximately $1.67 million
in unpaid wages and liquidated damages to his employees. See
Pls.' Ex. 4. Thus, at the time of the Condo's conveyance, Ji
Sung had probable and accrued liabilities amounting to $3.48
million, well above his established assets.

Defendants contend that, even if Ji Sung did have unpaid wage liabilities, his history negotiating down any such assessments makes it probable that any payment would be substantially lower than what was assessed. See Defs.' Mem 12. Evidence did establish that Ji Sung had once previously negotiated with the DOL and lowered penalty assessed against him, but only in the tens of thousands of dollars. No evidence showed that the earlier DOL investigation was likely to assess civil penalties or that Ji Sung was able to negotiate those away. By contrast, the 2010 KK Investigation was the second DOL investigation into Ji Sung's restaurants and, therefore, had statutory penalties that were likely to be assessed. Moreover, aside from Ji Sung's unsupported view, Defendants have put forward no evidence to show why Ji Sung was likely to win in any appellate action brought against the DOL for any assessed liability. In sum, Defendants' contention does not establish that Ji Sung had an objective probability of bridging a financial liabilities deficit of over $1.8 million.

Taking Ji Sung's assets against his probable and accrued liabilities stemming from unpaid wages and penalties, the evidence has established by a preponderance that, at the time of the Condo conveyance, the conveyance resulted in Ji Sung's

43

insolvency and, therefore, was a violation of DCL Section 273. See Deflora Lake Dev. Assocs., Inc., 2016 WL 7839191, at *4 (finding that "Plaintiff has presented no evidence that the salable value of its assets [following the conveyance] suffices to pay its debts as they come due" and therefore finding DCL Section 273 violation).

Analyzing the Condo conveyance under DCL Section 275 is similar to the Section 273 analysis, but different in a critical and dispositive manner: Ji Sung's subjective intent as to whether he "believe[d] that he . . . will incur debts behind his . . . ability to pay them as they mature." Shelly, 671 N.Y.S.2d at 806 (emphasis omitted). As described above, the Condo was not conveyed for fair consideration. Moreover, Plaintiffs have established that Ji Sung was aware of his unpaid wage violations, for which he believed he would be liable for some amount of liabilities. However, the amount of the 2010 KK Investigation, by itself, is just as likely to have been able to be talked down below the value of Ji Sung's assets as not, given how close the two values were to one another. Furthermore, while the debt as to Ji Sung's workers' unpaid wages had accrued, the record established does not show sufficient reason for Ji Sung himself to believe that he would be liable either for an

44

additional DOL investigations or a FLSA law lawsuit and any consequent penalties or judgment. As such, the conveyance of the Condo has not been established as fraudulent under Section 275. See In re Khan, 2014 WL 10474969, at *19 (finding that, while evidence adduced demonstrated that the debtor's insolvency, it did not show the "subjective belief that she would incur debts beyond her ability to pay" because such evidence was "consistent with the Debtor's holding the subjective belief that she would be unable to pay her debts as they came due" and "also consistent with the Debtor holding the view that she would be able to pay her debts in small increments").

For similar reasons, Plaintiffs have not established that the Condo conveyance was intentionally fraudulent and in violation of DCL Section 276.[16] As described above, under Section DCL 276, "[w]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given." In re Sharp Int'l Corp., 403 F.3d at 56.

---

[16]     Plaintiffs' summation papers make no arguments as to their Section 276 claim with regard to the Condo. See Pls.' Mem. 17-20 (including a subject header entitled "Plaintiffs Have Proven Their DCL § 276 Claims As To The Conveyances Of The Home And The Brooklyn Property"). However, Plaintiffs' Pretrial Memorandum indicates that this remains one of the claims. See Dkt. No. 107. It is addressed for the sake of completeness.

45

Looking to the badges of fraud implicated by the Condo's conveyance, certain are clearly established: the conveyance was between family members; there was a lack of fair consideration; and Ji Sung was insolvent at the time. While Ji Sung retained access to the Condo, he also retained partial ownership, so that badges is equivocal. Moreover, while the Condo conveyance was made shortly after the commencement of the DOL's investigation into Kum Kang, the transfer was made not made in secret and no evidence adduced indicated that the transfer was performed in a hasty or otherwise unusual way. Taken together, while not without suspicion, the evidence does not establish by the higher standard of clear and convincing evidence that the conveyance was made with fraudulent intent.

Accordingly, the conveyance of the Condo must be set aside as a violation of DCL Section 273. See Grace v. Bank Leumi Tr. Co. of NY, 443 F.3d 180, 189 (2d Cir. 2006) (citing Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 736-37 (S.D.N.Y. 1993) ("The proper remedy in a fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor.").

c. The Home and the Brooklyn Property

In comparison to the analysis performed with regard to the Condo's alleged fraudulent conveyance, the analysis necessary to determine whether the November 16, 2011, conveyances of the Home and Brooklyn Property were fraudulent is straightforward. Like as to the Condo, there is no dispute that there were conveyances of these two properties. Similarly, Plaintiffs have alleged that each conveyance was fraudulent under the same DCL sections as the Condo. Each DCL section will be considered in turn.

Under DCL Section 273, both conveyances were fraudulent. For the same reasons described above for the Condo, no evidence established that either of these conveyances was made for fair consideration. The conveyance documentation does not list anything more than "disproportionately small" consideration for the properties, and the many checks passed amongst the Yoos does not establish that money obtained from subsequent mortgages was given as payment to Ji Sung or his restaurants. Deflora Lake Dev. Assocs., Inc., 2016 WL 7839191, at *4. That the conveyances were given for free is reinforced by the fact that Ji Sung filed tax paperwork in 2011 that labelled the conveyances as gifts. Pls.' Ex. 36.

In the absence of fair consideration, Defendants have failed to show solvency following the conveyances. Aside from approximately $22,000 in profits from his restaurants, Defendants did not establish that Ji Sung had acquired any new salable assets between the Condo and the Home and Brooklyn Property transfers. Rather, following the conveyances, his assets decreased substantially, as without the Home or the Brooklyn Property, Ji Sung only still had one-third of the value of the Condo, amounting to $181,750. By contrast, his liabilities had increased, and now included the fully assessed amount from the 2010 KK Investigation, approximately $1,956,992, the amount assessed from the 2010 KG Investigation, which Ji Sung was aware had started a year ago and which in total assessed approximately $649,591, and the still-present and accrued liability from the FLSA Action, amounting to $1,674,977. For the same reasons described above, these were existing debts for which Ji Sung had probable liability amounting to approximately $4.28 million. As Ji Sung's liabilities exceeded his established salable assets following these conveyances, each satisfies the requirements of DCL Section 273. Grace, 443 F.3d at 189.

Plaintiffs' DCL Section 275 claims as to the Home and Brooklyn Property have also been met. Unlike the Condo conveyance, the evidence established that by the time Ji Sung transferred interest in the Home and Brooklyn Properties, he knew of the over $1.95 million in assessed penalties by the DOL from the 2010 KK Investigation, which he had no reason to believe would be reduced on appeal. He also knew about the 2010 KG Investigation, from which new liability was likely to be assessed. It cannot be said that in November 2011 Ji Sung believed he would have debt incurred from the FLSA Action. But even just accounting for the two DOL investigations, they alone establish that Ji Sung recognized that he would incur debts amounting to somewhere around or above $2 million. Ji Sung also knew that, following the conveyances, his depleted real estate assets amounted to approximately $181,750 and the value of the restaurants, even viewed most charitably and somewhat unrealistically based on the shareholders equity reflected in 2011 tax returns, amounted to approximately $1.1 million—in total, below what his likely debts would be. Indeed, it is a telling glimpse into Ji Sung's perception of his finances that he transferred, in their entirety, his interests in both properties at the same time, shortly after appealing the hefty penalties assessed by the DOL from the 2010 KK Investigation.

All told, it has been shown by a preponderance that Ji Sung was aware he would not be able to pay his future debts as a result of the conveyances. Accordingly the elements of DCL Section 275 have been met. See Perceptron, Inc. v. Silicon Video, Inc., No. 06 Civ. 412 (GTS) (DEP), 2011 WL 4595003, at *14 (N.D.N.Y. Sept. 30, 2011) (finding conveyance fraudulent under DCL Section 275 when defendant debtors "were aware that PVS would be unable to pay its debts after the transfer of its assets"); Cadle Co. v. Lieberman, No. 96 Civ. 495 (RR), 1998 WL 1674549, at *10 (E.D.N.Y. Sept. 11, 1998) (finding conveyance fraudulent under DCL Section 275 when debtor's "only assets . . . were his earned income, the bulk of which he transferred to his wife" and that, at the time, "he was indebted to a host of creditors including plaintiff" and by "transferring his earnings to his wife, he thereby rendered himself unable to meet his obligations to these creditors"); Shelly, 671 N.Y.S.2d at 806.

Lastly, Plaintiffs' DCL Section 276 claim as to the Home and Brooklyn Property has been proven. Turning to the badges of fraud, see McCombs, 30 F.3d at 328, two badges are again clearly present at the outset: conveyances between family members and made without fair consideration. In the context of the Home and

Brooklyn Property conveyances, additional badges support a finding of intentional fraud: that the conveyances were made on the same day, in the wake of a sizable DOL penalty assessment and the instigation of a second DOL investigation into Ji Sung's other restaurant; that Sandra was aware of Ji Sung's desperate need for money and wanted to get his name off of family assets; and that Ji Sung continued to reside at the Home in the same fashion following the transfer as before. While one badge points in the opposite direction—the conveyances were not made in secret—taken together, these multiple badges of indicia persuade that by the end of 2011, Ji Sung had determined he was going to owe more money than he had; by off-loading his real estate interests, Ji Sung was attempting to "hinder, delay, or defraud" creditors he believed would be knocking at his door in the future. DCL § 276. Accordingly, Plaintiffs have established by clear and convincing that the requisite intent for a DCL Section 276 claim existed as to the Home and Brooklyn Property conveyances. See Cadle Co., 1998 WL 1674549, at *13.

Accordingly, the conveyances of the Home and the Brooklyn Property must be set aside as violations of DCL Sections 273, 275, and 276. See DCL § 278 ("Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim

51

has matured, may, as against any person except for a purchaser for fair consideration without knowledge of the fraud at the time of the purchase . . . [h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or . . . [d]isregard the conveyance and attach or levy execution upon the property conveyed.").

## d. Satisfaction of the Home and Brooklyn Property Mortgages

Plaintiffs also seek a money judgment against Defendants to satisfy the mortgages taken out on the Home and Brooklyn Properties and return those properties to the value they had prior to the fraudulent conveyances and subsequent mortgages taken out on them by transferees. Plaintiffs rely upon the Court's "equitable power" to provide them "full relief" as part of its fraudulent conveyance action. See Pls.' Reply 17, Dkt. No. 129. Defendants contend that the transferee Defendants' individual assets may not be reached to restore any diminution of value from the mortgage because there was no participation or knowledge of Ji Sung's fraudulent intent. See Defs.' Mem. 25.[17]

---

[17]    To the extent that this is another attempt to argue this Court's jurisdiction over Defendants other Ji Sung, that

"As a general rule, the creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance." Newhouse, 20 F. App'x at 73; see also Marine Midland Bank v. Murkoff, 508 N.Y.S.2d 17, 25 (2d Dep't 1986) ("[T]he defrauded creditor is not entitled to an enhancement of position beyond what it was before the fraud. . . ."). However, "[a] money judgment against the grantee is sometimes an available form of relief." Murkoff, 508 N.Y.S.2d at 24 (collecting cases); see also McGillicuddy v. Laidlaw, Adams & Peck, No. 88 Civ. 4928 (LBS), 1995 WL 1081307, at *7 (S.D.N.Y. Aug. 14, 1995) (discussing money judgments for fraudulent conveyance actions and collecting cases). "[M]oney judgments are available where assets have been sold and commingled with a transferee's assets or when the grantee has disposed of the wrongfully conveyed property or depreciated it." Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC, No. 11 Civ. 3489 (JMF), 2014 WL 516695, at *2 (S.D.N.Y. Feb. 10, 2014) (internal citations and quotation marks omitted); see also Citibank, N.A. v. Benedict, No. 97 Civ. 9541 (AGS), 2000 WL 322785, at *15

argument has already been addressed in previous opinions of the Court and need not be discussed again. See Summ. J. Op., 2017 WL 4382078, at *4 n.3.

(S.D.N.Y. Mar. 28, 2000) (internal citations, quotation marks, and alterations omitted) (observing that when a "transferee has disposed of the property or has damaged it, the creditor should have personal judgment against the transferee for value . . . limited to the amount of plaintiff's claim, limited only by the value of the transferred property"). To that end, courts sometimes impose money judgments against transferees in the amount of the depreciated or encumbered property. See United States v. Bushlow, 832 F. Supp. 574, 582-83 (E.D.N.Y. 1993) (holding transferee son liable for mortgage taken out on conveyed house); see also Mallouk v. Am. Exch. Nat'l Bank, 142 N.Y.S. 724, 726 (1st Dep't 1913) ("It is true that in an action to set aside a fraudulent conveyance a court of equity may award a money judgment against as fraudulent grantee, provided he has, by some act of his own, depreciated the value or by sale put it out of his power to reconvey. In such case the judgment may be either for the value of the property at the time of the conveyance, or for the proceeds received by the grantee when he disposed of it."), aff'd, 216 N.Y. 670 (1915).

Equity merits a money judgment here. No evidence has been submitted to indicate that the banks from which the mortgages were received taken out on the Home and Brooklyn Property were

54

aware of Ji Sung and Sandra's fraudulent intentions. As such, the ability to set aside interest given to the banks as to those properties fraudulent conveyances stops at the Yoos. See N.Y. Debt. & Cred. Law § 278(1). To return the properties to Ji Sung's estate as-encumbered would allow the transferees to keep fruits of the fraudulent transfers. The purpose of New York's fraudulent conveyance laws is to return properties to the status quo ante and to hold transferees who alter that status quo, such as by taking out mortgages, "liable for any depreciation in the value of the property attributable to the . . . mortgage[s]." Bushlow, 832 F. Supp. at 582–83; see also 30 N.Y. Jur. 2d Creditors' Rights § 451 (with regard to the New York Debtor and Creditor Law, "the general equity powers of a court remain largely unimpaired, enabling a court to afford relief which is equitable in nature."); cf. Travelers Ins. Co. v. 633 Third Assocs., 973 F.2d 82, 87 (2d Cir. 1992) ("However, to the extent plaintiff would have been entitled, absent the conveyance, to obtain an equitable decree enjoining the [debtor] to apply its cash assets in a manner to preserve the property's value, it may likewise "reach" the cash assets for the same purpose in the fraudulent conveyance action . . . It does not seek to create any new rights to property by this action. Unlike the creditor

in Murkoff, [the creditor] seeks only to preserve the property
rights it had prior to the conveyance.").

The total assessed value of the unencumbered properties
exceeds the amount of the unpaid portion of the FLSA Action
judgment owed to Plaintiffs as judgment creditors in the FLSA
Action. As described above, Sandra was complicit in Ji Sung's
fraudulent conveyance of the properties and jointly and
severally liable for the mortgages taken out. Accordingly,
Sandra is liable for whatever amounts are necessary to satisfy
the mortgages on the Home and Brooklyn Property. See Bushlow,
832 F. Supp. at 582-583.

e. Attorneys' Fees

Plaintiffs seek attorneys' fees and costs in bringing this
action. Such an award is not recoverable for claims brought
under constructive fraud statutes like DCL Sections 273 or 275.
See, e.g., In re Stephen Douglas, Ltd., 174 B.R. 16, 22 (Bankr.
E.D.N.Y. 1994). However, attorneys' fees are awarded pursuant to
DCL Section 276-a when there has been a finding, by clear and
convincing evidence, that "where such conveyance is found to

have been made by the debtor and received by the transferee with actual intent . . . to hinder, delay or defraud either present or future creditors." DCL § 276-a; see also Newhouse, 20 F. App'x at 74 (quoting Carey v. Crescenzi, 923 F.2d 18, 20 (2d Cir. 1991) (stating that "under § 276-a attorney's fees may not be awarded against a defendant, who is a grantee of a fraudulent conveyance, without a specific finding that he was aware of and participated in the actual fraud").

The evidence described above established by clear and convincing evidence that the Home and Brooklyn Property were conveyed between Ji Sung and Sandra with the intent to defraud "present or future creditors." DCL § 273. Accordingly, upon a properly supported application, Plaintiffs shall be entitled to recover reasonable attorneys' fees for their DCL Section 276 claims against those two properties as to Defendants Ji Sung and Sandra. See First Keystone Consultants, Inc., 871 F. Supp. 2d at 123-24.

## IV. Conclusion

Based on the findings of fact and conclusions of law set forth above, Ji Sung's interests in the Condo, Home, and Brooklyn Property were fraudulently conveyed and must be set aside. Plaintiffs are also entitled to a money judgment as against Sandra as necessary to satisfy the mortgages taken out on the Home and Brooklyn Property. Plaintiffs are also awarded attorneys' fees as against Ji Sung and Sandra in connection with the intentionally fraudulent conveyances of the Home and Brooklyn Property.

The parties are instructed to confer and submit judgment on notice. In conjunction with the proposed judgment, Plaintiffs are to submit their fee application along with supporting documentation. Defendants may submit any objections to the fee application within fourteen days of Plaintiffs' application.

Upon determination of the amount of attorneys' fees, this Court will enter judgment consistent with this Opinion and Order.

It is so ordered.

**New York, NY**
**April /8/, 2018**

Swert

**ROBERT W. SWEET**
**U.S.D.J.**